Filed 7/23/26  In re L.H. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.H., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br>        Plaintiff and Respondent, <br><br> v. <br><br> M.H., <br><br>        Defendant and Appellant. | A174996 <br><br> (San Francisco City & County Super. Ct. No. JD223316) |

        M.H. (the biological father of L.H.) appeals from the termination of his parental rights under Welfare and Institutions Code[1] section 366.26—a course of action that respondent San Francisco Human Services Agency (the Agency) had recommended to the juvenile court.  According to M.H., the court erred in concluding M.H. had failed to show by a preponderance of the evidence that his son, L.H., "would benefit from continuing the relationship" with M.H.  (§ 366.26, subd. (c)(1)(B)(i).)  We disagree and will affirm the judgment accordingly.

_____

        [1] All statutory references are to the Welfare and Institutions Code.

1

## I. BACKGROUND

As a single father, M.H. raised his developmentally delayed son, L.H., for ten years. This case is the third dependency arising from those years, during which L.H. would often engage in the risky behavior of running away from home. Upon removing L.H. in this third dependency case, the juvenile court ordered supervised visitation for M.H. Next, the court sustained the Agency's amended dependency petition, declared dependency, and ordered out-of-home placement for L.H. and reunification services for father. Some 18 months later, after finding that returning L.H. (then age 12) to his father's care would be detrimental, and that there was no substantial probability of return, the court terminated reunification services, while maintaining visitation.

At the section 366.26 hearing underlying this appeal, the Agency recommended adoption as the permanent plan for L.H. M.H. objected to the termination of his parental rights. Four reports prepared by the Agency were entered into evidence,[2] along with visitation logs documenting the visits between M.H. and L.H. According to one of the reports, since returning from a regional-center placement to the home of the family that would ultimately seek to adopt him, "[t]here have been no reported runaway or other unsafe behaviors."

Additionally, three witnesses testified: a Protective Services Worker (PSW), a family friend who was a deacon at M.H.'s church, and M.H. himself. The PSW testified that M.H. had been "overall consistent" in attending the visits, which went "overall well." The father and son had a "friendly" relationship, but L.H. did not regard M.H. as a father figure. In the PSW's

---

[2] Those documents comprised two section 366.26 reports, one addendum report, and one ICWA progress report. The juvenile court also took judicial notice of its prior findings, orders, and judgments in the case.

opinion, there was no "significant secure attachment" between father and son, and that it would not "have a significant impact" on L.H. if he were never to see M.H. again. The PSW further testified there would be no benefit to L.H. "that would outweigh the benefits of adoption, and furthermore," L.H. "ha[d] been pretty clear with his desire for adoption and the fact that he did not feel safe in his father's care." On cross-examination, the PSW noted that L.H. "hadn't been resistant" to visits in general, but "had asked to no longer have" visits at the church he would sometimes attend with M.H.

The deacon described the general tenor of the visits he witnessed between M.H. and L.H. The father and son would greet each other, catch up on what had been happening in L.H.'s life in the past week, discuss school, and sometimes do schoolwork. The two would sometimes hug, and M.H. would encourage L.H. to keep doing well. Often, they would play the card game "Go Fish." The deacon testified that the father and son enjoyed a "loving relationship" that was "improving," attributing previous difficulties to the fact that M.H. "didn't understand about the disability of his son." The deacon's testimony was echoed in significant part by M.H., who testified to the positive nature of the father-son-visits, in addition to noting the recent deaths of L.H.'s mother and aunt. During the visits, M.H. would tell L.H. that he misses him, and L.H. would reciprocate that sentiment. In M.H.'s opinion, L.H. did not understand what adoption would mean for him.

Ultimately, the juvenile court concluded that M.H. had "not satisfied his burden to establish the beneficial relationship exception" under section 366.26, subdivision (c)(1)(B)(i), and terminated parental rights.

## II. DISCUSSION

Section 366.26, subdivision (c)(1)(B)(i), sets forth "the beneficial relationship exception," a "doctrine that allows the juvenile court, in

3

appropriate circumstances, to deviate from the presumptively preferred option of choosing adoption as a child's permanent plan after reunification has failed." (*In re J.R.* (2022) 82 Cal.App.5th 526, 530.)  There are "three elements the parent must prove to establish the exception:  (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631.)

The juvenile court's findings in these respects are subject to a hybrid standard of review.  (*In re Caden C.*, *supra*, 11 Cal.5th at p. 641.)  "The first two elements involve factual determinations to which the substantial evidence standard of review applies.  (*Id.* at pp. 639–640.)  The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion."[3]  (*In re G.H.* (2022) 84 Cal.App.5th 15, 26.)  Where, as here, "the party with the burden of proof did not carry the burden, 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*In re M.V.* (2025) 109 Cal.App.5th 486, 508.)  " 'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for

_____

[3] Relying on *In re M.V.* (2023) 87 Cal.App.5th 1155, 1185, M.H. argues for the first time in his reply brief that the abuse-of-discretion standard should not apply because the juvenile court erred in its analysis of the second element (benefit), and therefore was unable to exercise its informed discretion in conducting the related inquiry contemplated by the third element (detriment).  We decline to consider this argument because it was raised belatedly.  (See *In re R.Q.* (2023) 96 Cal.App.5th 462, 470.)  Still, we note in passing that M.H. has acknowledged the applicability of the abuse-of-discretion standard in his own opening brief, and that the juvenile court expressly noted that it would reach the same conclusion with respect to the third element "[e]ven if [M.H.] had satisfied the second" element.

a judicial determination that it was insufficient to support a finding." ' " (*Ibid*.)

Accordingly, we turn to M.H.'s evidence, as cited in support of the argument in his opening brief. In so doing, we pass over the undisputed evidence of M.H.'s regular visitation with L.H. which satisfies the first element. "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) To this end, M.H. marshals the following evidence: L.H. was thirteen years old and had spent the first ten years of his life in M.H.'s care; L.H. recognizes M.H. as his biological father; M.H. loves L.H.; M.H. is L.H.'s last living family member and connection to the community in which he was raised (and remaining so connected would "undoubtedly" benefit L.H.); M.H. encouraged L.H.'s ties to that larger social network; M.H. was cooperative in signing medical consent forms and frequently attended medical visits for L.H.; and various lines of evidence related to the content and quality of their visits, which were characterized by a "friendly" attachment, with laughing, joking, and fun.

But none of these lines of evidence require a finding of benefit " 'as a matter of law.' " (*In re M.V.*, *supra*, 109 Cal.App.5th at p. 508.) The inference of benefit that might ordinarily arise from L.H.'s age and years spent in M.H.'s care is undermined in part by the fact that L.H. had been out of M.H.'s care for three years and now wished to be adopted. The warmth and quality of the parental visits are contextualized by a Protective Services Worker's testimony that L.H. "is incredibly friendly just in his general engagement with *everyone*, and that definitely extends into the father's visits." (Italics added.) There is no reason to believe that M.H.'s signing of consent forms or presence at medical appointments is something L.H. would continue to

benefit from, given the role of L.H.'s future adoptive parents. And L.H. seems to assign somewhat less value to family or community connection: He remained confident in his desire to be adopted, and after planned visits to church and the library left him frustrated, L.H. said he wanted to discontinue those visits. For those reasons, we cannot conclude that M.H.'s evidence is " '(1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid.*)

We are mindful of the unique features of this case, especially the age of M.H., the portion of L.H.'s life spent in his custody, and the cognitive challenges affecting both of them. These issues were presented to the juvenile court and expressly considered in its rulings. Here, the juvenile court considered the many positive aspects of the father-son relationship and concluded, notwithstanding them, that "the relationship is more like a friend or extended family member rather than one who provides a positive substantial emotional attachment." It is the juvenile court's role to assess the credibility of witnesses, weigh evidence, and resolve conflicts. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 640.) This responsibility was discharged by the juvenile court. On appeal, we have no power to reweigh the evidence.

Thus, as there was no error in the juvenile court's finding that M.H. did not carry his burden to prove the second element of the beneficial-relationship exception by a preponderance of the evidence, he cannot adduce any abuse of discretion in the court's conclusion that terminating M.H.'s parental rights would not be detrimental to L.H.[4]

---

[4] As for M.H.'s contention that he is himself disabled and therefore "cannot be held to the same standard as a similarly situated, non-disabled parent," we must simply observe that our inquiry is not focused on holding *him* to any standard of conduct; instead, we are concerned with benefit to

6

## III.  DISPOSITION

We affirm.

---

*L.H.*:  "[O]nce reunification efforts end, the court looks toward the child's interest in permanence and stability, not the parent's interest in maintaining family ties."  (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1412.)

_____

SMILEY, J.

WE CONCUR:

_____

HUMES, P. J.

_____

LANGHORNE WILSON, J.

*In re L.H.* / A174996